NOTICE
Decision filed 02/28/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 170377

NO. 5-17-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* CUSTODY OF R.W. | | |
| (Susan Gregory, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | |
| | ) | |
| Travia B. and | ) | |
| Alvernon W., | ) | |
| | ) | No. 16-F-500 |
| Respondents | ) | |
| | ) | Honorable |
| (Alvernon W., Respondent-Appellant; | ) | Patricia H. Kievlan, |
| Raphael Hall, Intervenor)). | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Goldenhersh and Cates concurred in the judgment and opinion.

**OPINION**

¶ 1    For most of her life, R.W., the six-year-old child at the center of this dispute, was cared for by two individuals other than her biological parents—her biological uncle, Raphael Hall, and an unrelated individual, Susan Gregory. Her biological mother, Travia B., spent time with R.W., but she allowed Susan and Raphael to take on the responsibility of caring for her. When R.W. was an infant, Travia told her biological father, Alvernon W., that he was not the father. After that, Alvernon had no involvement in R.W.'s life until a petition to establish parentage was filed

1

in Missouri. After it was determined that Alvernon was, in fact, R.W.'s biological father, he sought to become more involved in her life.

¶ 2     Susan filed a petition for the allocation of parental responsibility and parenting time. The court found that Susan had overcome the presumption of a parent's superior right to custody but did not find that either parent was unfit. It allocated parenting time to all four of the parties, but it gave Susan sole decision-making responsibility and the majority of parenting time. After Alvernon filed a motion to set aside the parenting order, the court entered an order finding both parents to be unfit and a separate order denying Alvernon's motion. Alvernon appeals, arguing that (1) the court erred in finding him to be an unfit parent because no party alleged that he was unfit, (2) the court's finding of unfitness was against the manifest weight of the evidence, and (3) the court failed to consider his fundamental constitutional rights as a parent in its parenting order. Susan filed a motion to strike the portions of Alvernon's brief addressing the findings of unfitness, arguing that his notice of appeal does not identify the order containing those findings. We deny Susan's motion to strike, vacate the order finding Alvernon and Travia to be unfit, and affirm the court's parenting order.

¶ 3     R.W. was born on July 3, 2011. Alvernon was not at the hospital when Travia gave birth, but she called him a few hours later, and he arrived within half an hour. At that time, Alvernon was 20 years old and had no other children. Travia was in her mid-20s and had five other children. According to Alvernon, he asked Travia if the baby was his, and she told him there was a possibility that he was not the baby's father. This angered him, and he left the hospital.

¶ 4     A week later, however, Travia and Alvernon began to share in the responsibility of caring for R.W. According to Alvernon, he cared for R.W. Mondays through Fridays, and Travia cared for her on the weekends. According to Travia, she and Alvernon each cared for R.W. 3½ days

2

per week. This arrangement continued until R.W. was three months old, when Travia arrived at Alvernon's home with the police. According to Travia, she called the police that day because when she arrived to pick up R.W., no one answered the door. She testified that she thought Alvernon and his family could not hear her knocking on the door. Alvernon testified that, at the time, he thought Travia called the police because he was not R.W.'s father. In any case, an officer took R.W. from Alvernon and handed her to Travia, and Alvernon did not see R.W. again for six months.

¶ 5    Within days after this incident occurred, Travia brought R.W. to the home of her brother, Raphael, and asked Raphael to take care of her. Travia testified at the hearing that she did so because she was evicted from her apartment, forcing her and her children to move in with her grandmother. Her grandmother suggested asking Raphael to care for R.W. At that time, Raphael lived with his mother, his long-term partner, Chuck, and his best friend, Candice. At the time of the hearing, Raphael was still living with Chuck and Candice. Chuck's teenage daughter also stayed with them every other weekend.

¶ 6    Raphael originally rented property in St. Louis from Susan's parents; however, after Susan's father was diagnosed with ALS in 2007, Susan took over management of her parents' rental properties. She became friendly with Raphael. She knew that Raphael suffered from sickle cell disease and that he did not have a vehicle or driver's license. She offered to help him out when she could, including by driving him to doctor's appointments. In October 2011, when Susan learned that Raphael was caring for a baby, she offered to help. Initially, Susan cared for R.W. at her home in Belleville, Illinois, on weekends, and Raphael cared for her each week from Monday morning to Friday afternoon. Over time, however, the amount of time Susan spent

caring for R.W. increased due to various factors, including Raphael's health, R.W.'s medical needs, and R.W.'s schooling.

¶ 7     In 2012, R.W. was diagnosed with cancer. Susan's mother, Pat, who is a retired nurse, explained at the hearing that doctors believed R.W. was likely born with cancerous cells in her fallopian tubes. However, there were no outward signs of the disease until R.W. suddenly fell ill at nine months old. Pat explained that the cells grew into a tumor, which attached itself to a blood vessel near R.W.'s ovary. The tumor was thus able to nourish itself and grow very quickly. Susan and Pat took R.W. to the emergency room on a Friday night. She had a high fever and had to be stabilized before she could undergo surgery to remove the tumor the following Monday.

¶ 8     All four of the parties spent much of that weekend at the hospital with R.W., as did Susan's mother, Pat, and Raphael's partner, Chuck. Both Travia and Alvernon testified that they had a discussion outside the hospital during which Alvernon asked Travia whether he was R.W.'s father. Travia told him he was not R.W.'s father. Alvernon testified that he was disappointed by this news but had no reason to disbelieve Travia. He soon moved to Kansas City with his girlfriend, Mia Sutton. At the time of the hearing, Alvernon and Mia were still together.

¶ 9     After the surgery, Travia signed a document permitting R.W. to be released to Susan's care. The document indicated that Susan's relationship to R.W. was that of a family friend and godmother. According to Raphael, one of the reasons for this arrangement was the fact that Pat, as a nurse, would be best able to administer medications to R.W. After an initial recuperation period, Susan and Raphael returned to sharing the responsibility of caring for R.W. However, as mentioned earlier, Susan began taking on a larger share of the responsibility. When R.W. was released from the hospital, she had to return each Tuesday for blood draws and checkups with her oncologist. Because Raphael could not drive her to these appointments, Susan began

4

bringing R.W. back to his house after her Tuesday appointments instead of on Monday mornings, as she had done previously. Many weeks, R.W. arrived at Susan's home on Thursday rather than on Friday.

¶ 10    Periodically, Raphael was hospitalized as a result of complications from sickle cell disease. During these periods, Susan cared for R.W. full time. At one point, Raphael underwent two hip replacement surgeries, the second of which was performed eight weeks after the first. During his recuperation period, Susan cared for R.W. full time. After he recovered, Raphael and Susan once again shared the responsibility of caring for R.W.

¶ 11    When R.W. was old enough to begin preschool, Susan looked at preschools near her home in Illinois. When she discussed the matter with Raphael, he told her that he wanted R.W. to attend a preschool in St. Louis, near his home. Together, Susan and Raphael visited three preschools in St. Louis. They decided jointly to enroll her in one of those schools. On the registration paperwork, Raphael was listed as R.W.'s father and Susan was listed as her mother.

¶ 12    When R.W. entered elementary school, Susan enrolled her at Zion Lutheran, a private school in Belleville. Susan also enrolled R.W. in several different activities—swimming lessons, dance classes, Daisies, horseback riding lessons, and Center of Creative Arts, a theater company in St. Louis. At Raphael's request, Susan scheduled these activities so they would take place during her time with R.W. Although Raphael attended many of R.W.'s school events, dance recitals, and other events, Travia and Alvernon did not.

¶ 13    In 2014, the Missouri Department of Public Aid filed a petition to establish parentage in a Missouri court. At the hearing in this matter, Travia denied that the petition was filed because she applied for public assistance on behalf of R.W. She testified that she wanted to establish paternity in order to "gain full custody from Alvernon." She claimed that this was because she

5

wanted to avoid complications that sometimes arose when she encountered paperwork requiring the signatures of two parents—for example, when she applied for a passport for R.W. Travia acknowledged that she listed R.W. as a dependant for purposes of Medicaid.

¶ 14 Alvernon testified that he was unaware of the Missouri parentage case until May 2016, when he received a notice directing him to submit to DNA testing because he had been named as the father of R.W. Alvernon was determined to be the father, and he was ordered to pay Travia $119 per month in child support. Both Travia and Alvernon testified that Alvernon paid more than this amount. According to Alvernon, he was unaware that R.W. was not living with Travia.

¶ 15 Although Travia did not live with R.W. or take responsibility for her care, she did visit with her, including occasional overnight visits. Early in the summer of 2016, Alvernon arranged with Travia to visit with R.W. Raphael and Susan were not happy that Travia arranged this visit without consulting with them. Susan was afraid that Alvernon might take R.W. back to Kansas City with him.

¶ 16 On July 19, 2016, Susan filed a petition for allocation of parenting time and parental responsibilities. She alleged that R.W. had been in her physical custody since approximately October 2011 and that Travia had failed to show a reasonable degree of care, concern, or interest in R.W. since that time. Susan further alleged that, "On information and belief," Alvernon had no contact with R.W. before the summer of 2016 and that neither parent showed any interest in R.W.'s education, extracurricular activities, or medical care. She alleged that, "On information and belief, a support case was opened in St. Louis, Missouri, by the Department of Public Aid, and an order finding ALVERNON [W.] to be the biological father and to pay child support in the amount of $119 per month was entered by the Court." Susan requested that she be given sole authority to make decisions concerning significant parenting responsibilities and the majority of

parenting time. She requested that parenting time be awarded to both Travia and Alvernon, but she asked that this time be limited to daytime visits at scheduled times. Susan named Travia and Alvernon as respondents, but she did not name Raphael as a respondent or request that parenting time be allocated to him. Along with her petition, Susan filed a motion seeking a restraining order enjoining Alvernon and Travia from removing R.W. from her care or from the State of Illinois. Susan did not consult with Raphael or Travia before filing the petition, which led to a breakdown in her previously cordial relationship with Raphael. The court entered an *ex parte* temporary restraining order on July 21, and it entered an injunction on July 28.

¶ 17 On August 25, 2016, Travia filed a response to the petition. She requested that she be given sole decision-making authority for parental responsibility and the majority of parenting time. She also asked that Susan's petition be dismissed.

¶ 18 On September 1, 2016, Raphael filed a petition to intervene and for allocation of parental responsibility and parenting time. He alleged that R.W. was not in the physical custody of either of her parents. He alleged that she was in Raphael's physical custody from approximately October 2011 until July 28, 2016, when Susan was granted sole custody pursuant to a court order. He repeated the allegations in Susan's petition concerning Travia and Alvernon. Raphael requested that he be given sole authority to make decisions concerning significant parental responsibilities and the majority of parenting time. However, he later filed a proposed parenting plan that called for Susan and Raphael to share decision-making authority and an equal division of parenting time between the two of them.

¶ 19 On October 19, 2016, Alvernon filed a motion to dismiss Susan's petition, a motion for the appointment of a guardian *ad litem* (GAL), a response to Susan's petition, and a proposed parenting plan. Alvernon requested the majority of parenting time with R.W. and that he be

7

given authority to make decisions about significant parental responsibilities. The court denied Alvernon's motion to dismiss, a ruling he has not appealed. The court granted his motion to appoint a GAL and appointed Dustin Hudson to act in that capacity. The court entered a temporary parenting order that provided Alvernon with supervised visits with R.W. once per month. The temporary order also set up parenting time for Raphael and Travia.

¶ 20    On June 1, 2017, Hudson filed a report with the court. He noted that in preparing his report, he interviewed all four of the parties and spoke to R.W. Hudson found that from the time of R.W.'s surgery onward, Raphael had physical custody of R.W. on Tuesday and Wednesday nights, and Susan had physical custody of her each week from Thursday through Tuesday. He found that Susan and Raphael were the only individuals who handled the day-to-day tasks of caring for R.W. before these proceedings began and that they were also "the only individuals that have been involved in the significant decision making" for R.W. However, it was "clear to [him] that Susan essentially made all the significant decisions." He explained that Susan was the one who took the initiative to find activities for R.W., even if she generally did so with the approval of Raphael.

¶ 21    Hudson stated that R.W. was performing well in school, and that Susan helped out at the school and was "very active" in R.W.'s extracurricular activities. For this reason, he believed that the statutory best interest factor of the child's adjustment to her home, school, and community favored an award of the majority of parenting time to Susan. He explained that R.W. had many friends at school and that she had "adjusted extremely well to living with Susan and her mother, Pat." He also believed that Susan could best provide R.W. with stability, which was her most important need. He noted that, in reaction to these proceedings, R.W. asked Susan if she was "trying to give her away." He opined that R.W. saw Susan's house as her home.

8

¶ 22    Hudson discussed his conversation with R.W. in the report. He stated that she seemed to genuinely love all of the adults involved in her life. Although she "seemed a little confused" when Hudson first asked her about Alvernon, "once she realized who [he] was talking about, she had nothing but good things to say about him." R.W. also told Hudson that she liked her current custody arrangement. She liked visiting and playing with all of the parties, and she liked having two mothers and three fathers. (We note that at the hearing, Pat explained that R.W. called Susan and Travia "Mama Sue" and "Mama Shay" and that she referred to Raphael and Chuck as "Big Daddy" and "Little Daddy." Although R.W. usually referred to Alvernon by his name, she sometimes called him "Dad.")

¶ 23    Hudson opined that Susan and Alvernon were capable of communicating with each other concerning R.W.'s best interests and cooperating to care for her. He noted that Alvernon told him that once he got to know Susan, he developed a good relationship with her and trusted her to do what was right for R.W. Alvernon also acknowledged to Hudson that moving R.W. to Kansas City with him would not be in R.W.'s best interests. He told Hudson that he believed she should to continue live with Susan.

¶ 24    Hudson recommended that Susan continue to have the majority of parenting time with R.W. and that each of the parties be given some parenting time. He believed that it would be confusing to R.W. to have overnight parenting time with Alvernon at this time, but he recommended that Alvernon's parenting time gradually be increased to include overnight visits. Hudson had reservations about awarding significant amounts of parenting time to Travia and Raphael, however. He indicated that unlike Alvernon, neither Travia nor Raphael had taken advantage of all the parenting time scheduled for them in the court's temporary order. He was also concerned because there was a lot of crime in the neighborhood where they both lived.

9

Hudson also believed that R.W. should have time to enjoy her extracurricular activities, many of which were scheduled on weekends. He explained that R.W. needed to have "the chance to be a child without worrying about her visitation schedule."

¶ 25 The court held a hearing over two days in June 2017. The court heard extensive testimony from Susan, Pat, Travia, Raphael, Alvernon, and GAL Dustin Hudson. Hudson's testimony essentially repeated what he wrote in his report.

¶ 26 Pat testified that she had a great relationship with R.W., who called her "Gamma." She testified that she knew that R.W. loved Raphael and Chuck. Although she was not sure how R.W. felt about Alvernon, R.W. seemed to enjoy her visits with him and looked forward to seeing him. She noted that R.W. especially looked forward to getting to see Alvernon's young son, O.W., and that she seemed to have more of a relationship with O.W. than she had with Travia's children. Pat testified that Alvernon and his girlfriend, Mia, were always very pleasant during their visits.

¶ 27 Susan testified that when she first met R.W., Raphael told her that he was caring for his sister's baby because his sister was unable to do so. She testified that before these proceedings began, she thought that she and Raphael were "pretty good partners" in raising R.W. Susan acknowledged that when Alvernon began making an effort to be a part of R.W.'s life, she was concerned because she did not know anything about him. However, she testified that Alvernon and Mia were always kind and pleasant during their scheduled visits. Asked to describe those visits, Susan replied, "They spend good quality time together. I see it as good quality time. He's very interactive with her. And he seems to care about her." Susan testified that she believed Raphael, Travia, and Alvernon should all be involved in R.W.'s life in some manner, but she did not know how.

10

¶ 28    Raphael testified that since these proceedings began, he saw less of R.W. than he used to, and he missed her. He believed that Susan should continue to be a part of R.W.'s life because "she's been there the whole time." Asked how R.W.'s time should be divided among the four parties, Raphael said, "I just would like the best for her. *** I would like for it to go back to the way it was because *** there was no problems." He admitted that it would be hard for him to trust Susan again, explaining that he felt betrayed when she filed the petition to initiate these proceedings without consulting him. However, he hoped that things could go back to the way they were before these proceedings began because he and Susan used to cooperate in caring for R.W. He explained that he, Susan, and Pat had created a family for R.W.

¶ 29    Raphael testified about the relationship between Travia and Susan. He noted that he had discussions with Susan about Travia's parenting on "a couple" of occasions. He explained that when Travia wanted overnight visits with R.W., Susan had some concerns about Travia's home. He testified that in order to smooth things over between Susan and Travia, he tried to explain that "how [Travia] raises her kids can be different from how [he] and Susan [were] raising [R.W.]." In particular, he had to explain to Susan that Travia had to use space heaters to keep her children warm because she did not have a lot of money. On cross-examination by Susan's attorney, Raphael admitted that he shared Susan's concerns about Travia's care.

¶ 30    Raphael testified that Travia never asked to have custody of R.W., but she did ask to have overnight visits. He also testified, however, that there were periods in R.W.'s life during which Travia showed little interest in spending time with her. He noted that Susan and Travia sometimes argued over the care Travia provided when R.W. visited her home. According to Raphael, "Travia would be like, 'you know, I'm just going to come and get my baby and we can just leave this alone.' You know how petty things can get." He testified that Susan responded to

11

this by telling Travia that she could not do that because Susan and Raphael had been raising R.W. for five years and that she would move away with R.W. rather than allow that to happen. Raphael did not believe either Travia or Susan meant what they said during this exchange. Susan denied ever making the comment.

¶ 31    Travia testified that she lived with her six other children. She had five children who were older than R.W. and a nine-month-old baby. Travia testified that Susan made the comment about wanting to move out of state with R.W., but her account was different from Raphael's. According to Travia, when Susan and Raphael confronted her about her unilateral decision to allow R.W. to visit with Alvernon, she admitted that she too was worried that he might try to take R.W. back to Kansas City. She told them that she decided she just had to trust him and that she knew that if he did take R.W. to Kansas City, Susan would go and bring her back. Travia claimed that in response to this, Susan told Travia she was right and said that she would move out of state with R.W. rather than allow Alvernon to take her to Kansas City. Travia acknowledged that she never asked Raphael or Susan to return R.W. to her custody. She explained that she did not feel "like it was fair to [R.W.] to just step in and rip her out of all of their lives, so I did what I could to try to come together with them to parent her as one."

¶ 32    Alvernon testified that at the time of the hearing, he lived in Kansas City with Mia and O.W., but his parents and siblings lived in the St. Louis area. He testified that he intended to move back to the area in order to be able to spend more time with R.W. He noted that he had found a place to live and that he and Mia were both looking for jobs.

¶ 33    Alvernon testified that he felt "vindicated" when he was notified of the parentage proceedings in Missouri. Once it was determined that he was R.W.'s father, he asked to see her right away. He visited with R.W. at the beginning of July 2016, before these proceedings were

initiated. After that visit, Alvernon asked Travia to work out a visitation schedule. He testified that she initially asked him to visit every weekend, which he agreed to do, but she stopped returning his phone calls. Alvernon assumed that R.W. was living with Travia at this time.

¶ 34    Alvernon asked the court to give him sole decision-making authority and parenting time every weekend. He asked that the majority of parenting time be allocated to either Travia or Raphael. He acknowledged that he had previously indicated that he wanted Susan to have the majority of parenting time and that he wanted to share decision-making authority with her. Asked to explain why he changed his position, he explained that some of the testimony he had heard during the hearing led him to believe that Susan, Travia, and Raphael conspired to keep him out of R.W.'s life, and he no longer believed that they had R.W.'s best interests at heart.

¶ 35    At the end of the hearing, the court took the matter under advisement. The court stated on the record that R.W. was "a well-loved little girl" and that each of the four parties was "capable of taking care of her and meeting her needs as a child." The court also stated that all four parties appeared to want what was best for R.W.

¶ 36    We note that there was also testimony at the hearing that Susan took R.W. on vacations to Florida, California, and Mexico, among other places, and that she threw elaborate parties for R.W. for her birthday and holidays. Both Travia and Raphael expressed concern at the hearing that they did not want this case to be decided by what Susan could afford to provide for R.W. We have not discussed this testimony in any detail in this opinion because we do not believe it played a significant role in the court's decision, and it plays no role in our decision. This decision turns instead on the nature of the relationships that have been established between R.W. and the adults in her life.

13

¶ 37    On July 5, 2017, the court entered a parenting order. The court first expressly found that Susan "has overcome the presumption of the superior right of a parent to have custody over a non-parent." The court further found that it would be in R.W.'s best interests for Susan to be given the majority of parenting time with R.W. and sole decision-making responsibility. The court noted that it did not believe it was possible for any of the parties to cooperate in making decisions due to their strained relationships.

¶ 38    In support of these conclusions, the court made the following findings of fact: Neither Travia nor Alvernon was involved in making any decisions concerning R.W.'s welfare since Travia relinquished custody of R.W. to Raphael in October 2011. Travia was involved in R.W.'s life "sporadically," but she never requested that custody be returned to her, and Alvernon did not attempt to be a part of R.W.'s life until after the Missouri court determined that he was her biological father in 2016. Susan and Raphael shared in the responsibility of caring for R.W., but Raphael was not always able to provide this care on a full-time basis due to health concerns. Susan and Raphael also shared in the responsibility of making decisions for R.W., although Susan took most of the initiative in making those decisions.

¶ 39    The court then set forth a parenting schedule allocating parenting time on Wednesday afternoons to Raphael and dividing parenting time on the second weekend of each month between Alvernon and Travia. The court acknowledged that this was less time than is ordinarily allocated, but the court noted that it would be impossible to allocate parenting time according to a "standard schedule" in light of the fact that four different individuals wanted to have parenting time with R.W. The schedule did not give Alvernon or Travia overnight parenting time for the first several months, but it increased their parenting time to include overnight visits beginning in 2018. Alvernon's parenting time was to increase further beginning in 2019.

14

¶ 40 On August 4, 2017, Alvernon filed a motion to set aside the parenting order. He noted that no party presented any evidence showing that he was an unfit parent and that the court did not find him to be unfit. He argued that absent such a finding, a court may not "infringe upon the fundamental right of a parent to make childrearing decisions" without running afoul of the due process clause of the fifth amendment to the United States Constitution.

¶ 41 On September 6, 2017, prior to holding any additional hearings in the matter, the court entered an order making what it called "additional findings of fact." The court found both Travia and Alvernon to be unfit parents. It found Alvernon to be unfit because (1) he failed to demonstrate a reasonable degree of interest, concern, or responsibility for R.W.'s welfare (see 750 ILCS 50/1(D)(b) (West 2016)), (2) he evidenced an intent to forego his parental rights for a period of 12 months before these proceedings began (see *id.* § 1(D)(n)(1)), (3) he did not file an action to establish parentage within 30 days of being informed that he was likely R.W.'s father (see *id.* § 1(D)(n)(2)(i)), and (4) he did not make a good faith effort to pay child support until he was ordered to do so (see *id.* § 1(D)(n)(2)(ii)).

¶ 42 On September 11, 2017, Alvernon's motion came before the court for a scheduled hearing. At the outset, the court noted that after it entered its initial order and Alvernon filed his motion to set that order aside, it "entered an additional order." The court then stated:

"And let me preface reading that order with when I heard this case and when I typed up the [original] order it was my sincere hope that these parties could continue to get along with one another ***. I'm smart enough to know when you start throwing around terms like unfit parents, people get their feelings hurt. And I was trying to avoid people having their feelings hurt because I do believe *** that Mr. [W.], Ms. [B.], and Mr. Hall should all continue to play a part in [R.W.'s] life."

15

The court then read the September 6 order into the record.

¶ 43    Alvernon's attorney asked for a continuance to give him time to respond to the findings in the new order, noting that he did not see a copy of the order until that morning. Susan's attorney opposed his request, arguing that the findings in the order did not "substantively change [Alvernon's] argument." The court denied the request for a continuance. Then, without giving the parties an opportunity to present evidence or arguments, the court stated, "and I'm going to deny your request to set aside the July 5, 2017, order." The court went on to state, "I will tell you that I probably should have put the findings of unfitness in the July 5 order, but again I really wanted to try and tap lightly or walk lightly with regard to these people's interactions and relationships with each other."

¶ 44    The same day, the court entered an order denying Alvernon's motion to set aside its earlier order. Alvernon timely filed this appeal. Neither Raphael nor Travia has appealed the trial court's rulings.

¶ 45    Alvernon first argues that the court erred in finding him to be an unfit parent, both because no party alleged that he was unfit and because the court's finding was against the manifest weight of the evidence. Susan filed a motion to strike the portions of his brief raising these claims, arguing this court does not have jurisdiction to consider those arguments because Alvernon's notice of appeal did not specifically identify the court's September 6, 2017, order. We ordered her motion to be taken with the case. For the following reasons, we now deny that motion.

¶ 46    Filing a notice of appeal is a necessary step to confer appellate jurisdiction. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 176 (2011). Illinois Supreme Court Rule 303(b)(2) provides that a notice of appeal "*shall* specify the judgment or part thereof or other orders

16

appealed from and the relief sought." (Emphasis added.) Ill. S. Ct. R. 303(b)(2) (eff. Jan. 1, 2015). Once a notice of appeal is filed, the trial court loses jurisdiction to consider the judgments, orders, or portions of judgments specified in the notice, and those matters proceed to the appeals court, "not as a new case but as a continuation of the case in the trial court." *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433 (1979) (citing *Wolcott v. Village of Lombard*, 387 Ill. 621, 624 (1944)). The notice of appeal thus confers jurisdiction of the appellate court to consider the judgments, parts thereof, or orders specified. *Id.* The notice of appeal also serves the purpose of informing the appellee that the appellant has sought review of the trial court's rulings. *Id.* In light of these dual purposes, an appeals court acquires jurisdiction to consider only those judgments, parts thereof, or orders specified in the notice of appeal. *Id.* at 434.

¶ 47 Although we do not have jurisdiction to consider judgments or orders that are not specified in the notice of appeal, we *do* have jurisdiction to consider judgments or orders that, while not explicitly identified in the notice of appeal, may reasonably "be inferred from the notice as intended to be presented for review on the appeal." *Id.* It is reasonable to infer from a notice of appeal that the appellant seeks review of unspecified orders if they "directly relate[ ] back to the judgment[s] or order[s]" that are expressly identified in the notice. *Id.* Put another way, an unspecified order is subject to review "if it is a 'step in the procedural progression leading' to the judgment[s] specified in the notice of appeal." *Id.* at 435 (quoting *Elfman Motors, Inc. v. Chrysler Corp.*, 567 F.2d 1252, 1254 (3d Cir. 1977)).

¶ 48 In determining whether we have jurisdiction to review an order that is not explicitly identified in a notice of appeal, we must also keep in mind that although cases addressing this question "often speak in terms of jurisdiction, it is generally accepted that a notice of appeal is to be liberally construed." *Id.* at 433. If a notice of appeal, "when considered as a whole, fairly and

17

adequately sets out the judgment complained of and the relief sought so that the successful party is advised of the nature of the appeal," it is sufficient to confer appellate jurisdiction. *Id.* at 433-34.

¶ 49　As Susan points out, the notice of appeal filed by Alvernon in this case identifies only the court's orders of July 5 and September 11, 2017. The notice does not specify the September 6, 2017, order or specifically address the findings contained in the order. Nevertheless, we believe the order is a procedural step leading to one or both of the judgments that were explicitly identified in Alvernon's notice of appeal.

¶ 50　As we discussed earlier, the court entered the order after Alvernon filed a motion arguing that the court's July 5, 2017, parenting order must be set aside precisely because it did not contain findings of unfitness. It thus appears that the court entered the September 6 order containing these findings because it believed that the findings were necessary to support its September 11 order denying Alvernon's motion to set aside the July 5 order. As such, the September 6 order was a step in the procedural progression that led to the court's September 11 order, which *was* explicitly identified in the notice of appeal. As we also discussed earlier, the court indicated during the motion hearing that it "probably should have put the findings of unfitness" in its earlier order. This shows that the findings were closely related to the July 5 order, which was also explicitly identified in Alvernon's notice of appeal.

¶ 51　We note that the September 6 order, which contained only findings of fact and did not direct any party to take any action, would not have been appealable in its own right. See *id.* at 436. We also emphasize that Susan was not misled or confused by Alvernon's notice of appeal. She in fact responded to his arguments. See *id.* In light of these facts and in light of the close relationship between the three orders, we believe that review of the September 6 order may fairly

18

be inferred from the notice of appeal. We therefore deny Susan's motion to strike, and we turn our attention to Alvernon's arguments concerning the court's findings of unfitness.

¶ 52     Alvernon first argues that the court erred in finding him to be an unfit parent because no party alleged that he was unfit. We agree.

¶ 53     We note that our research has uncovered *no* Illinois cases involving findings of unfitness outside the context of proceedings to terminate parental rights. In termination proceedings, the petition to terminate must contain an allegation that the parent is unfit and must also allege the specific statutory grounds for finding the parent to be unfit. A court may not terminate parental rights on grounds that are not alleged in the petition. *In re Michael M.*, 364 Ill. App. 3d 598, 609 (2006) (citing *In re D.C.*, 209 Ill. 2d 287, 295-96 (2004)). The court may not terminate parental rights unless it finds the parent to be unfit by clear and convincing evidence. *Douglas R.S. v. Jennifer A.S.*, 2012 IL App (5th) 110321, ¶ 5. Termination of parental rights is a two-step process. The court first holds a fitness hearing where the State or other petitioner must prove the parent is unfit by clear and convincing evidence. *Id.* If the court makes this finding, the case then proceeds to a best interest hearing at which the petitioner must show that termination is in the child's best interests by a preponderance of the evidence. *Id.*

¶ 54     Here, of course, Alvernon's parental rights were *not* terminated. Susan argues that this distinction makes the rules we have just discussed inapplicable to the case before us. She points out that in determining the best interest of the child, a court must consider "an extensive list of statutory factors, including 'any other factor that the court expressly finds to be relevant.' " See 750 ILCS 5/602.7(b)(17) (West 2016). She argues that the court's findings of parental unfitness contained in the order of September 6, 2017, are nothing more than "any other factor" the court found relevant. We are not persuaded.

19

¶ 55    We recognize that there is a significant difference between a termination case and a case involving the allocation of parenting time. The latter does not permanently sever the parent-child relationship and all the rights that go with it, while the former clearly does. See *In re Petition to Adopt Shuman*, 22 Ill. App. 3d 151, 153 (1974) (making this observation in an adoption proceeding). However, a judicial determination of parental unfitness cannot be treated as any other finding of fact relevant to a child's best interests due to the potentially dire consequences that can flow from such a determination. As we have explained, once a finding of unfitness has been made, parental rights can thereafter be terminated if a petitioner can show by a preponderance of the evidence that doing so is in the child's best interest. *Douglas R.S.*, 2012 IL App (5th) 110321, ¶ 5. This is obviously a much lower burden than the clear and convincing evidence required to find the parent unfit. Thus, we find that the protections applicable to findings of unfitness in termination cases are applicable to *any* finding of parental unfitness— assuming it is ever appropriate to enter such findings in cases where termination of parental rights is not at issue.

¶ 56    In termination cases, the fitness hearing and the best interests hearing are conducted separately for two reasons. First, as we have already explained, the standard of proof required at each of the hearings is different. *Id.* Second, "[b]ecause the focus of the two hearings is different, and each has differing purposes, evidence that is admissible at one hearing may not be admissible at the other." *Id.* (citing *In re D.L.*, 191 Ill. 2d 1, 10-13 (2000)).

¶ 57    Here, the court held one hearing, which was focused solely on R.W.'s best interests. Alvernon had no notice that the court intended to make a finding of unfitness. The court entered the order finding Travia and Alvernon to be unfit without holding an additional hearing focused on the issue of their fitness as parents. At the scheduled hearing on Alvernon's motion to set

20

aside the parenting order, the court did not allow him to present any evidence or arguments addressing the finding of unfitness. The order does not even expressly state that its findings are supported by clear and convincing evidence. To allow a judicial determination of parental unfitness to stand under such circumstances would be untenable. We hold that a court may not make findings of parental unfitness absent an allegation of unfitness regardless of whether parental rights are sought to be terminated. We also note that one of the statutory grounds relied upon by the court—failure to pay support for the child—is only available if a petition to terminate parental rights is filed by the child's mother or her husband. 750 ILCS 50/1(D)(n) (West 2016). The order containing unrequested findings of unfitness must therefore be vacated.

¶ 58    Because we have concluded that the court erred by entering an order finding the parents to be unfit when no party alleged them to be unfit, we need not address Alvernon's contention that the findings were against the manifest weight of the evidence. We note in passing, however, that the findings of unfitness were inconsistent with statements the court made at the hearing. As we discussed earlier, the court explicitly stated on the record that each of the four parties loved R.W. and had the ability to care for her and meet her needs.

¶ 59    Finally, Alvernon argues that the court erred in awarding Susan sole decision-making authority and the majority of parenting time. We note that he does not argue that the findings in the July 5 parenting order were against the manifest weight of the evidence or that the court abused its discretion. See *In re Marriage of Dafoe*, 324 Ill. App. 3d 254, 259 (2001). Instead, he contends that the court erred as a matter of law because it failed to give any weight to his fundamental constitutional rights as a parent. We disagree.

¶ 60    Alvernon is correct in asserting that "it is beyond dispute" that the right of parents to the custody and care of their children is a fundamental liberty interest protected by the due process

21

clause of the fifth amendment. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). It is presumed that a fit parent will act in the best interest of his child. *Id.* at 68. Thus, "there is a well-established presumption" that a fit parent has a right to the care and custody of his child that is superior to the right claimed by any other party. *In re Marriage of Dafoe*, 324 Ill. App. 3d at 259 (citing *In re Custody of Townsend*, 86 Ill. 2d 502, 508 (1981)). This presumption, however, is not absolute. *Id.* A nonparent seeking to retain custody of a child in her care "must demonstrate good cause" to overcome the presumption of a parent's superior right. She must also show that retaining custody would be in the child's best interest. *Id.* (citing *In re Adoption of E.L.*, 315 Ill. App. 3d 137, 158 (2000)). Once the presumption has been overcome, a court may award custody to a nonparent without finding that the parents are unfit. *Id.*

¶ 61    This is because courts have long recognized that " 'Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.' " (Emphasis omitted.) *Lehr v. Robertson*, 463 U.S. 248, 260 (1983) (quoting *Caban v. Mohammed*, 441 U.S. 380, 397 (1979)). The nature of these enduring relationships plays a crucial role in determining whether there is good cause to overcome the presumption of a parent's superior right to custody.

¶ 62    We find guidance in the Illinois Supreme Court's analysis in the case of *In re Parentage of J.W.*, 2013 IL 114817. That case, like this case, involved a determination of paternity several years after the child was born. *Id.* ¶¶ 4-6. We note that despite this similarity, the case is not precisely analogous to the case before us. There, the child was in the custody of her biological mother (*id.* ¶ 4), and the question was not whether a nonparent was entitled to the majority of parenting time, but whether the biological father was entitled to any parenting time (*id.* ¶ 1).

22

Nevertheless, the supreme court's observations concerning the importance of evaluating a child's existing emotional bonds are pertinent in this context as well.

¶ 63    There, the child's mother became pregnant after a one-time encounter with the father, Steve. She apparently assumed that the baby's father was her boyfriend, Jason. *Id.* ¶ 4. Jason signed a voluntary acknowledgement of paternity and was listed as the child's father on her birth certificate. *Id.* The mother later married Jason, but they subsequently divorced. *Id.* ¶ 5. Steve saw photographs of the child on the mother's social media site. He thought he saw a familial resemblance, so he contacted the mother to discuss the possibility that he was the child's biological father. *Id.* ¶ 6. DNA testing revealed that Steve was, in fact, J.W.'s biological father. *Id.* Steve subsequently filed a petition to establish the existence of a parent-child relationship and requested parenting time (then called visitation). *Id.* ¶ 8.

¶ 64    The trial court determined that Steve bore the burden of proving that it would be in the child's best interest for him to be given any parenting time. *Id.* ¶ 23. The court noted that J.W. "identified Jason as her father because of their long-standing loving relationship" and that J.W. did not understand Steve's relationship to her. *Id.* ¶ 26. The court found that, under these circumstances, it was not in J.W.'s best interest to introduce Steve into her life, at least not at that time, and denied his request for parenting time. *Id.* ¶¶ 26, 28. In reaching this conclusion, the trial court found that a presumption that it is in a child's best interest to have parenting time with a noncustodial parent was not applicable under the facts of that case. *Id.* ¶ 27.

¶ 65    The appellate court reversed, finding that it is presumptively in a child's best interest for a noncustodial parent to have parenting time. *Id.* ¶ 30. The court held that Steve, as the biological father, was entitled to reasonable parenting time unless the evidence showed that this "would seriously endanger" the child's health or well-being. *Id.* ¶ 32.

23

¶ 66    The supreme court disagreed with both the trial court and the appellate court about the application of the presumption in favor of awarding parenting time to the noncustodial parent. *Id.* ¶ 52. The supreme court explained that this presumption "reflects a legislative recognition of the need to protect the *preexisting* parent-child bond that presumably developed prior to the divorce or separation of two parents." (Emphasis added.) *Id.* ¶ 47. The court noted that the presumption in favor of visitation may not accurately reflect the actual circumstances of children in custody disputes that arise outside of the typical dissolution setting. This is particularly true in cases "where paternity is established long after birth." *Id.* ¶ 48. In such cases, the court explained, the biological father is seeking parenting time when "a relationship with the child may not have *ever* been forged." (Emphasis added.) *Id.*

¶ 67    The supreme court concluded that although the presumption in favor of awarding parenting time to both parents is indeed applicable in a parentage case, that presumption can be overcome with evidence that parenting time is not in the child's best interest without meeting the "more onerous 'serious endangerment' standard" that is applicable in dissolution cases. *Id.* ¶ 52. The court also held that the noncustodial father in a parentage case has the burden of demonstrating that parenting time will be in the child's best interest. *Id.* ¶ 53. The court then went on to find that, in light of the child's lack of any meaningful relationship with Steve, the evidence supported the trial court's determination that parenting time was not in her best interests at that time. *Id.* ¶¶ 55-59.

¶ 68    Similar concerns arise in cases in which courts must determine whether a nonparent has overcome the presumption that a biological parent has a superior right to the care and custody of his child. In *In re Marriage of Dafoe*, this court considered the nature of a child's existing bonds with both his biological parents and his actual caregivers in addressing that very question.

24

¶ 69 There, the child's biological parents divorced when he was an infant, and the father had minimal contact with his son for the next five years. *In re Marriage of Dafoe*, 324 Ill. App. 3d at 255-56. Sole custody was awarded to the mother in the dissolution proceedings. Soon thereafter, she and the child moved in with her parents. *Id.* at 255. Three years later, the mother moved to Texas, leaving the child in Illinois in the care of her parents. After two more years passed, the father requested custody. *Id.* at 256. By this point, the six-year-old child had lived with his grandparents for five years, and they had been his primary caregivers for two years. The trial court found that the grandparents had shown good cause to overcome the presumption of the father's superior right to custody. *Id.* at 256-57.

¶ 70 In upholding the trial court's findings, this court emphasized that "The grandparents have cared for Nicholas virtually all of his life. Nicholas has bonded with them and expressed his desire to stay with them." *Id.* at 261. We concluded that "The biological bond between father and son simply does not overcome the *actual, developed relationship* between Nicholas and his grandparents." (Emphasis added.) *Id.* Other districts of the Illinois Appellate Court have likewise upheld awards of custody or primary parenting time to nonparents who have established enduring bonds with children that have been in their care. See, *e.g.*, *Young v. Herman*, 2018 IL App (4th) 170001 (upholding a trial court's award of custody to grandparents who had cared for the child for most of her life); *In re Custody of T.W.*, 365 Ill. App. 3d 1075 (2006) (same).

¶ 71 In this case, as in the *Dafoe* case, the court *did* consider the presumption of superior rights that flows from Alvernon's biological relationship to R.W. As we stated earlier, the court expressly found that Susan had overcome this presumption. The evidence supports this finding. Susan has taken on the lion's share of the responsibility both for providing R.W.'s day-to-day care and for making decisions about her schooling, activities, and medical care. Before these

25

proceedings began, R.W. established close emotional bonds to most of the adults involved in this case—Susan, Pat, Raphael, Chuck, and Travia. As Alvernon recognized in the proceedings before the trial court, R.W.'s bonds with Susan and the other adults in her life were forged before he reentered R.W.'s life in the summer of 2016. Although R.W. loved all the adults in her life, she considered Susan's home to be her home. The court emphasized R.W.'s need for stability in finding that Susan should continue to have primary parenting time. This evidence was sufficient to show good cause to overcome the presumption of the parents' superior rights.

¶ 72    We note that Alvernon did not request the majority of parenting time at trial. On appeal, he argues that he should be allowed to determine with whom his daughter associates. It is not clear whether this argument means that he wants the right to determine that R.W. should no longer associate with Susan at all, in spite of their deep bond, or simply that he believes the decision-making authority granted to Susan should instead be granted to him. In either case, we do not find his argument persuasive. His argument is based on *Troxel* and *Lulay v. Lulay*, 193 Ill. 2d 455 (2000). Both of those cases involved court-ordered grandparent visitation against the wishes of custodial parents. *Troxel*, 530 U.S. at 69; *Lulay*, 193 Ill. 2d at 457-58. This court has previously found both cases to be inapplicable in the context of a custody dispute between parents and the actual caregivers "who virtually raised the child." *In re Marriage of Dafoe*, 324 Ill. App. 3d at 258. We likewise find them to be inapplicable here.

¶ 73    Susan has shown good cause to overcome the presumption of Alvernon's superior rights as a parent, and the evidence supports the court's conclusion that it is in R.W.'s best interests for Susan to have all of the decision-making authority and most of the parenting time. Thus, the court's allocation of parenting time and parental responsibility does not violate Alvernon's fundamental rights, and we affirm the initial parenting order and the order denying Alvernon's

26

motion to set it aside. However, for the reasons discussed earlier, we vacate the order finding Alvernon and Travia to be unfit.

¶ 74    Judgment affirmed; order containing findings of unfitness vacated; motion to strike denied.

2018 IL App (5th) 170377

NO. 5-17-0377

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* CUSTODY OF R.W. | ) | |
| (Susan Gregory, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | |
| | ) | |
| Travia B. and | ) | |
| Alvernon W., | ) | |
| | ) | No. 16-F-500 |
| Respondents | ) | |
| | ) | Honorable |
| (Alvernon W., Respondent-Appellant; | ) | Patricia H. Kievlan, |
| Raphael Hall, Intervenor)). | ) | Judge, presiding. |

---

**Opinion Filed:**      February 28, 2018

---

**Justices:**      Honorable Melissa A. Chapman, J.

Honorable Richard P. Goldenhersh, J., and
Honorable Judy L. Cates, J.,
Concur

---

**Attorney for Appellant**      Andrew Mossman, Cordell & Cordell, P.C., 100 West Main Street, 2nd Floor, Belleville, IL 62220

---

**Attorney for Appellee**      Heather Wescoat Dabler, The Law Offices of Susan Parnell Wilson, 14 South Second Street, Belleville, IL 62220

---